UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

vs.

Case No. 8:03-CR-77-T-30TBM

GHASSAN ZAYED BALLUT

_____/

### DEFENDANT GHASSAN BALLUT'S MOTION TO DISMISS OR STRIKE COUNTS ONE THROUGH FOUR, THIRTEEN THROUGH FIFTEEN, EIGHTEEN, NINETEEN, TWENTY-TWO, TWENTY-FOUR, TWENTY-FIVE, TWENTY-SEVEN THROUGH THIRTY-TWO, THIRTY-THREE, THIRTY-FIVE, THIRTY-SIX, AND THIRTY-EIGHT THROUGH FORTY-THREE AND MEMORANDUM OF LAW

The Defendant, GHASSAN BALLUT, by and through his undersigned counsel, pursuant to Federal Rule of Criminal Procedure 12(b)(2), hereby requests this Honorable Court to dismiss or alternatively to strike Counts One through Four, Thirteen through Fifteen, Eighteen, Nineteen, Twenty-two, Twenty-four, Twenty-five, Twenty-seven through Thirty-two, Thirty-three, Thirty-five, Thirty-six, and Thirty-eight through Forty-three of the Superseding Indictment filed in this cause as to GHASSAN BALLUT, and as grounds therefor would state:

### Count One

1. The Defendant is charged in Count One, starting from an unknown date in 1984, with a violation of Title 18, United States Code, Section 1962(d) by conspiracy to violate Title 18, United States Code, Section 1962(c), while being employed by and associated with the enterprise known as the Palestinian Islamic Jehad - Shiqaqi Faction (hereinafter "PIJ"), in that he knowingly, willfully, and unlawfully combined, conspired, confederated and agreed with others to conduct and participate in the conduct and affairs of PIJ through a pattern of racketeering activity, consisting of multiple acts involving murder, extortion, money laundering, use of

facilities in interstate or foreign commerce with intent to promote and carry on an unlawful activity, conspiracy to kill, kidnap, maim or injure persons in a foreign country, providing material support to a foreign terrorist organization, fraud and misuse of visa, permits, and other documents, and obstruction of justice, it being part of the conspiracy that each conspirator would commit at least two acts of racketeering in the conduct of the affairs of PIJ. See Count One, paragraphs 26 and 27.

2. Scrutinizing the entirety of Count One of the Superseding Indictment, consisting of 43 paragraphs and 324 Overt Acts on 99 pages, for all references to the Defendant and his actions in support of the racketeering conspiracy allegation, the totality of such allegations may be summarized as follows:

a. On an unspecified date, the Defendant was at one time a member of the PIJ cell in Chicago, Illinois, presumably sometime after his entry into the United States on September 12, 1985. There is no allegation that the Defendant's membership in the PIJ was permanent or continuing. See Count One, paragraph 12.

b. On or about April 8, 1996, the Defendant along with Co-Defendant HATEM FARIZ and FARIZ's brother Fariz Ahmed incorporated the American Muslim Care Network (AMCN) as a non-profit Illinois corporation which dissolved on or about September 2, 2003, and the Defendant served as secretary or vice president of AMCN. See Count One, paragraph 19, and Overt Act 235.

c. On January 23, 1995, the President of the United States issued Executive Order 12947 which declared a national state of emergency and designated certain organizations as threats to the Middle East peace process and as "Specially Designated Terrorists,"

including PIJ and Co-Defendant ABD AL AZIZ AWDA   There is no allegation that the Defendant was a member of PIJ as of January 23, 1995.  See Count One, paragraph 22.

d.  On October 8, 1997, the Secretary of State under Title 18, United States Code, Section 219, designated PIJ as a "foreign terrorist organization," making it illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to PIJ.  There is no allegation that the Defendant was a member of PIJ as of October 8, 1997.  See Count One, paragraph 23.

e.  AMCN along with the PIJ, the Islamic Concern Project, Inc. (ICP), the Muslim Women's Society (MWS), the World and Islam Studies Enterprise, Inc. (WISE), the Islamic Academy of Florida, Inc. (IAF), and the Elehssan Society constituted an "enterprise" under Title 18, United States Code, Section 1961(4).  See Count One, paragraph 25.

f.  Without specific, direct, or personal reference to GHASSAN BALLUT, it is alleged the Co-Defendants used various specified methods and means in this conspiracy, including establishing PIJ cells, committing acts of violence and threats against Israel, videotaping PIJ members planning acts of violence, making public statements, raising funds by conferences, speeches, traveling, sending documents, using the Internet, advocating, and writing, holding wills for PIJ members, transferring and wiring money, performing PIJ management functions, associating with other terrorist organizations, using instrumentalities and facilities of interstate and foreign commerce to promote the affairs of the enterprise, arranging communications with enterprise members, providing assistance to terrorists and other enterprise members by making misleading and evasive

statements to the Immigration and Naturalization Service (hereinafter "INS"), utilizing codes in conversations to conceal activities and identities, obtaining support from influential individuals while concealing their own identities, making false statements to the media, and concealing the purposes of their acts. See Count One, paragraphs 28 through 42.

g. On or about September 29, 1991, the Defendant spoke during the celebration of the fifth anniversary of the Battle of Al-Shujaiya and was introduced as the ICP representative in Chicago, and in speaking the Defendant supported the Jihad and criticized Israel. See Count One, Overt Act 9.

h. On or about October 11, 1991, the Defendant concealed in an INS document that he was a member and leader of the PIJ in the Chicago area. There is no allegation that he had the legal obligation to do so on that date or that he was in fact a "member and leader" of PIJ on that date. See Count One, Overt Act 10.

i. On or about December 9, 1991, SAMI AL-ARIAN purchased two checks totaling $52,000 payable to the Defendant on a joint account with Co-Defendant TASIR HASSAN AL-KHATIB. See Count One, Overt Act 11.

j. On or about December 27, 1991, the Defendant attended the fourth annual ICP conference. See Count One, Overt Act 12.

k. On or about February 24, 1992, Co-Defendant MAZEN AL-NAJJAR caused a check for $11,250 payable to the Defendant to be written on an account belonging to Mohammed Elnaggar. See Count One, Overt Act 16.

l. On or about April 11, 1994, in a telephone conversation, Co-Defendant SAMI AL-

ARIAN asked the Defendant if he had heard about "Raed" who blew himself up, and the Defendant said he read about it in the paper. See Count One, Overt Act 97.

m. On or about April 15, 1994, the Defendant and SAMI AL-ARIAN had a telephone conversation and discussed SAMI AL-ARIAN's travel plans and the reaction to the Afula bombing. See Count One, Overt Act 103.

n. On or about March 14, 1995, the Defendant attempted to have a telephone conversation with Co-Defendant RAMADAN ABDULLAH SHALLAH. The Indictment does not state the actions or efforts that constituted this attempt. See Count One, Overt Act 168.

o. On or about May 12, 1995, RAMADAN ABDULLAH SHALLAH sent a facsimile to the Defendant regarding the status of United States visa for himself and his wife and the necessity of his wife renewing her Palestinian Authority travel permit and discussing her justification for traveling to the Territories. See Count One, Overt Act 204. It should be noted that SHALLAH was declared a Specially Designated Terrorist on November 27, 1995.

p. On or about May 24, 1995, in a telephone conversation, Co-Defendant SAMI AL-ARIAN requested the Defendant to contact Naim Nasser Bulbol because SAMI AL-ARIAN wanted to speak with a recently released person about his interrogation by the authorities. There is no allegation in the Indictment that such an overseas call was in fact arranged by the Defendant. See Count One, Overt Act 206.

q. On or about May 11, 2000, in a telephone conversation, Co-Defendant HATIM FARIZ told Co-Defendant SAMEEH HAMMOUDEH that he and four others were

permanent members of the board of a mosque in Chicago and asked that he convey to Co-Defendant SAMI AL-ARIAN that they were in control. The Defendant is not mentioned by name in this allegation. See Count One, Overt Act 258.

r. On or about December 18, 2001, HATEM FARIZ and the Defendant caused $1,300.00 to be transferred from AMCN through Middle East Financial Services to Salah Abu Hassanein in Gaza. See Count One, Overt Act 286.

s. On or about June 2, 2002, the Defendant had a telephone conversation with HATEM FARIZ and discussed having seen RAMADAN ABDULLAH SHALLAH on television and being surprised that HAMAS was not in attendance. See Count One, Overt Act 289.

t. On or about June 5, 2002, in a telephone conversation, the Defendant discussed a suicide bombing in Haifa, Israel, with Co-Defendant HATEM FARIZ, describing it as "successful," saying that twenty were killed and fifty were injured, and stating it was a PIJ operation, and HATEM FARIZ later discussed this conversation with Co-Defendant SAMI AL-ARIAN. See Count One, Overt Acts 291 and 292.

u. On or about June 7, 2002, in a telephone conversation, the Defendant and Co-Defendant HATEM FARIZ discussed a variety of subjects, including problems at the Islamic Academy of Florida, accusations of theft against Co-Defendants SAMI AL-ARIAN and SAMEEH HAMMOUDEH and others, the reaction to the June 5, 2002, terrorist bombing, the involvement of Ali Sammoudi's cousin in the bombing, the previous transfers of money to Salah Abu Hassanein in Gaza, and the desperate financial situation of Naim Nasser Bulbol. See Count One, Overt Act 293.

v. On or about June 19, 2002, in a telephone conversation, the Defendant told Co-

Defendant HATIM FARIZ that the United States Government had obtained the Defendant's financial information and records from a bank, and HATIM FARIZ then passed this along to Co-Defendant SAMI AL-ARIAN, who said he did not want to discuss it on the telephone. It is clear from this allegation that the United States was aware prior to this conversation that the United States had obtained this financial information. See Count One, Overt Act 295.

w. On or about July 10, 2002, HATEM FARIZ instructed the Defendant not to call him on any of his numbers and to tell others not to call him from the mosque or any other place because he was concerned he was being watched. See Count One, Overt Act 297.

x. On or about August 2, 2002, HATEM FARIZ and the Defendant had a telephone conversation in which FARIZ said he had spoken with Naim Nasser Bulbol and they discussed the death of HAMAS leader Salah Shehada, its effect on HAMAS, and Shehada's personal relationship with SHALLAH. See Count One, Overt Act 299.

y. On or about August 20, 2002, HATEM FARIZ and the Defendant had a telephone conversation in which FARIZ described assaulting a child when he lived in the Middle East and that FARIZ was assisting Co-Defendant SAMEEH HAMMOUDEH with immigration matters. See Count One, Overt Act 301.

z. On or about August 24, 2002, HATEM FARIZ told the Defendant by telephone that Co-Defendant MAZEN AL-NAJJAR was now living with MUHAMMED TASIR HASSAN AL-KHATIB. See Count One, Overt Act 302.

aa. On or about August 28, 2002, in a telephone conversation, HATEM FARIZ relayed to the Defendant instructions SAMI AL-ARIAN had given FARIZ in the event SAMI

AL-ARIAN was arrested, without any description as to the nature of these preparations. See Count One, Overt Act 303.

bb. On or about September 13, 2002, in a telephone conversation, Co-Defendant HATIM FARIZ told the Defendant that he had recently spoken with Salah Abu Hassanein who thanked him for the money although it was less than last year, to which the Defendant said that Hassanein must realize things had changed since last year. HATIM FARIZ also said that Hassanein told him that RAMADAN ABDULLAH SHALLAH was in the hospital for depression, and they discussed a press report that three PIJ members had recently been killed. See Count One, Overt Act 306.

cc. On or about September 28, 2002, HATEM FARIZ and the Defendant discussed by telephone the associations of the "Brothers" that were now operating as medical institutions and collecting medical supplies instead of donations to evade prohibitions on fund-raising for terrorist groups. See Count One, Overt Act 310.

dd. On or about September 30, 2002, in a telephone conversation, the Defendant and Co-Defendant HATIM FARIZ discussed HATIM FARIZ's prior attempts to telephone RAMADAN ABDULLAH SHALLAH, HATIM FARIZ having been told by RAMADAN ABDULLAH SHALLAH that it was dangerous to call him from the United States. See Count One, Overt Act 312.

ee. On or about October 19, 2002, HATEM FARIZ had a telephone conversation with Naim Basser Bulbol in Gaza in which he gave a report on the Defendant, SAMI AL-ARIAN, and SAMEEH HAMMOUDEH. See Count One, Overt Act 314.

ff. On or about November 8, 2002, HATEM FARIZ and the Defendant had a telephone

8

conversation in which they discussed raising funds for the purchase of an ambulance. See Count One, Overt Act 316.

gg. On or about November 9, 2002, HATEM FARIZ and the Defendant discussed by telephone an AMCN fund-raising event in Florida, and FARIZ told the Defendant that SAMI AL-ARIAN had urged a group of donors to contribute to AMCN, that FARIZ had distributed pledge forms to donors, that they would arrange for AL-ARIAN to conduct another AMCN fund-raising event in Chicago, and that the Defendant would provide donors with a tax exempt number for AMCN. See Count One, Overt Act 318.

hh. On or about November 10, 2002, HATEM FARIZ and the Defendant caused $7,000.00 to be transferred from AMCN through Middle East Financial Services to Salah Abyu Hassanein in Gaza. See Count One, Overt Act 319(C).

ii. On or about November 11, 2002, HATEM FARIZ had separate telephone conversations with the Defendant and SAMI AL-ARIAN to report on the status of AMCN find-raising efforts and to discuss whether they should retain a percentage of the donations for costs. See Count One, Overt Act 320.

3. Considered both individually and collectively, the overt acts ascribed to the Defendant are insufficient to allege that the Defendant knowingly, willfully, and unlawfully combined, conspired, confederated and agreed to conduct and participate in the affairs of the PIJ as the alleged enterprise through a pattern of racketeering activity as alleged in Count One of the Indictment.

4. Considered both individually and collectively, the overt acts ascribed to the Defendant are insufficient to allege that the Defendant knowingly, willfully, and unlawfully participated in

9

any of the described acts constituting a pattern of racketeering activity.

5. Considered both individually and collectively, the overt acts ascribed to the Defendant are insufficient to allege that the Defendant knowingly, willfully, and unlawfully participated in any of the means and methods of the conspiracy.

6. The sole basis for connecting the Defendant to the PIJ as the enterprise is the allegation that on some date on or after September 12, 1985, the Defendant was a member of the PIJ cell in Chicago, and there is no allegation that he was a member of PIJ at any time during the commission of any Overt Acts alleged against him. See Count One, paragraph 12.

7. The PIJ was not declared to be a Specially Designated Terrorist group by Executive Order until January 23, 1995.

8. Part of the legal basis invoked and cited for Executive Order 12947 that so designated the PIJ was Title 50, United States Code, Sections 1701 and 1702.

9. Although Section 1702 authorizes the President of the United States to prohibit transactions in foreign exchange, transfers among banks, and imports and exports of currency, and to block property interests and confiscate property, the authority granted to the President specifically does not include authority to regulate or prohibit, directly or indirectly:

a. any postal, telegraphic, telephonic, or other personal communication that does not involve the transfer of anything of value;

b. donations by persons under United States jurisdiction of articles such as food, clothing, and medicine to relieve human suffering;

c. the importation from or exportation to any country of any information or informational materials, regardless of the medium; or

10

d. transactions ordinarily incident to travel to or from any country, including importation of baggage, maintenance within any country including payment of living expenses, and arrangement or facilitation of travel.

10. To the extent that the Indictment relies on the finding that PIJ is a Specially Designated Terrorist group by Executive Order to establish the Defendant's conspiracy to participate in an enterprise, the Indictment fails to allege sufficiently that the Defendant was a member of or participated in the activities of PIJ after the effective date of the Executive Order, being January 24, 1995, before which PIJ was not so designated.

11. To the extent that the Indictment relies on activities by the Defendant that consisted of personal communications not involving the transfer of anything of value, or donations of specified goods, or the importation or exportation of information or informational materials, or transactions incident to travel, such activities are outside the purview of the Executive Order and cannot constitute overt acts in support of PIJ as an enterprise.

12. All such overt acts alleged against the Defendant involving participation or membership of the PIJ prior to its designation as a Specially Designation Terrorist group should be stricken as immaterial to any criminal allegations.

13. All such overt acts alleged against the Defendant that are beyond the authority of the Presidential Executive Order should be stricken as immaterial to any criminal allegations.

14. Count One improperly relies on Florida Statutes 782.04, 777.011, 777.04, and 836.05, for conspiracy to commit multiple acts involving murder and extortion, as there are insufficient allegations that such acts if committed would have fallen within the jurisdiction of the State of Florida and would have constituted crimes as defined by the elements contained in

11

these statutes, and as such these allegations should be stricken. See Count One, paragraph 26 (a) and (b).

15. For each of the reasons stated above, Count One should be dismissed as to the Defendant.

### Count Two

16. The Defendant is charged in Count Two, starting from an unknown date in or about 1988, with knowingly, unlawfully, and willfully combining, conspiring, confederating and agreeing to murder and maim persons at places outside the United States, in violation of Title 18, United States Code, Section 956(a)(1). See Count Two, paragraph 6.

17. Count Two incorporates the means and methods of Count One, paragraphs 28 through 42, which make no specific or personal reference to the Defendant, and also incorporates the Overt Acts of Count One, paragraphs 236 through 324, which are described in sub-paragraphs q through ii under paragraph 2 above.

18. The activities ascribed to the Defendant in the incorporated paragraphs of Count One, considered individually and as a whole, are insufficient to allege that the Defendant combined, conspired, confederated and agreed to conduct and participate in the murder or maiming of persons outside the United States.

19. In the described telephone conferences in the incorporated paragraphs, there is no construction or interpretation that would permit a conclusion that the Defendant's involvement in or contribution to these conversations promoted or facilitated any murder or maiming.

20. Specifically, any and all references to the Defendant's discussions of and references to acts of murder and maiming occurred after the events which were matters of public knowledge

12

and do not demonstrate or suggest prior knowledge or intent to participate or assist in murder or maiming, and such references attempt to criminalize speech protected by the First Amendment of the United States Constitution.

21. In addition, Title 18, United States Code, Section 956(a)(1), contains the elements that the person charged must be "within the jurisdiction of the United States" at the time of the conspiracy and that the contemplated act of murder or maiming must be "an act that would constitute the offense of murder . . . or maiming if committed in the special maritime and territorial jurisdiction of the United States," yet Count Two of the Indictment fails to recite these essential elements and therefore fails to allege a crime against the Defendant.

22. For these reasons, Count Two should be dismissed as to the Defendant.

### Count Three

23. The Defendant is charged in Count Three, starting from an unknown date in 1988, with conspiracy to knowingly provide material support to a designated foreign terrorist organization, specifically the PIJ.

24. As the Defendant is charged under Title 18, United States Code, Section 2339B, Count Three improperly recites and relies upon Presidential Executive Order 12947 to allege that the PIJ became a Specially Designated Terrorist organization on January 23, 1995, the effective date of Executive Order 12947, as it is only the Secretary of State acting pursuant to Title 8, United States Code, Section 1189(a), that can designate a foreign terrorist organization as defined in Title 18, United States Code, Section 2339B(g)(6), and therefore reference to Executive Order 12947 in Count Three should be stricken. Cf. Count Three, paragraphs 2 and 3(j).

25. According to the Government's own allegations, it did not become unlawful to

13

provide material support to the PIJ until the designation by the Secretary of State on October 7, 1997. See Count Three, paragraph 3(r).

26. All events and activities ascribed to the Defendant in support of Count Three occurring before October 7, 1997, are not material to the allegations in Count Three and should be stricken from the Superseding Indictment.

27. Despite the specificity of the means and methods of the conspiracy, Count Three contains no specific allegations against the Defendant concerning his providing material support to the PIJ, except for the allegations that he and other Co-Defendants "did continue to engage in PIJ fund-raising and support activities in a calculated manner to conceal the nature of what they were doing and the source and recipients of the support" throughout the 1990's to the present without any description concerning the conduct that the Defendant "did continue" or the degree to which he participated with the other Co-Defendants. See Count Three, paragraph 3(q).

28. Further, the incorporated Overt Acts in paragraphs 242 through 324, as described in sub-paragraphs q through ii of paragraph 2 above, contribute nothing to the allegation of material support, as there is no reference to the Defendant providing any "material support or resources" as that phrase is defined at Title 18, United States Code, Section 2339A(b) and incorporated at Section 2339B(g)(4), and as such these allegations are insufficient to allege the Defendant conspired to provide material support to the PIJ.

29. Because Count Three fails to make sufficient allegations to constitute the offense charged, Count Three should be dismissed.

### Count Four

30. The Defendant is charged in Count Four, starting from an unknown date not later

than January 25, 1995, with combining, conspiring, confederating, and agreeing to knowingly and willfully violate Executive Order 12947 by  to making and receiving contributions of funds, goods, or services to or for the benefit of the PIJ, ABD AL AZIZ AWDA, Fathi Shiqaqi, and RAMADAN ABDULLAH SHALLAH, in violation of Title 50, United States Code, Sections 1701 et seq., and Title 31, Code of Federal Regulations, Section 595, et seq.

31. Count Four relies heavily upon Presidential Executive Order 12947 issued pursuant to Title 50, United States Code, Sections 1701 et seq., but as previously presented above, this Order did not take effect until January 25, 1995, prior to which the PIJ was not a Specially Designated Terrorist organization.

32. As such, all allegations concerning any activities to make and receive contributions of funds, goods, or services to PIJ prior to January 24, 1995, against the Defendant are immaterial and should be stricken.

33. Additionally, as RAMADAN ABDULLAH SHALLAH was not designated as a Specially Designated Terrorist until November 27, 1995, all allegations concerning any activities to make and receive contributions of funds, goods, or services to RAMADAN ABDULLAH SHALLAH prior to November 27, 1995, against the Defendant are immaterial and should be stricken.

34. The Defendant is not named in any substantive allegation in Count Four, and the allegations of the incorporated paragraphs 139 through 324 of Count One, as described in sub-paragraphs n through ii of paragraph 2 above, are insufficient to allege a charge against the Defendant, in that there is no allegation of these incorporated paragraphs nor is there any proper interpretation or construction of these incorporated paragraphs that allows for the conclusion that

15

the Defendant was making or receiving contributions of funds, goods, and services to or for the benefit of the PIJ.

35. To the extent that the substantive allegations of Count Four rely for legal authority upon the provisions of Title 31, Code of Federal Regulations, Section 595, et seq., to charge a criminal offense against the Defendant, such allegations should be stricken as such purported authority results from an unconstitutional and improper delegation of legislative power by the Congress of the United States to the executive jurisdiction of the United States Department of the Treasury and from a violation of the separation of powers doctrine. See Count Four, paragraphs 6 and 9.

36. For these reasons, Count Four should be dismissed.

## Additional Arguments for Dismissal Common to Counts One through Four

37. The allegations in Counts One, Three, and Four rely heavily upon the designation of certain persons and entities as Specially Designated Terrorists (SDT's) and Foreign Terrorist Organizations (FTO's) by Executive Order 12947 as permitted by the International Emergency Economic Powers Act, Title 50, United States Code, Section 1701 et seq., and by the Secretary of State as permitted by the Antiterrorism and Effective Death Penalty Act of 1996. See Count One, paragraphs 22 and 23, Count Three, paragraph 3(j), Count Four, paragraphs 2 through 8. This exercise of executive authority in naming SDT's and FTO's is based on an improper delegation of legislative authority by the Congress to the executive branch and also violates the separation-of-powers doctrine.

38. Further, the designation of persons and entities as SDT's and FTO's by the executive authorities as authorized by the Congress amount to legislative acts directed against designated

16

persons, pronouncing them guilty of alleged crimes without trial or conviction, resulting in the extinguishment of their civil rights and legal capacities, amounting to a bill of attainder against these persons and entities, and as Congress is constitutionally prohibited from passing bills of attainder, the authority to make bills of attainder cannot be extended by the Congress to the executive branch, and such authority is void, and therefore all references to Executive Order 12947 and the designation of persons and entities as SDT's and FTO's should be stricken. See U.S. Const. art I, § 9, cl. 3.

39. Because the allegations in Counts One through Four fail to adequately inform the Defendant of the nature and cause of each of the accusations against him, the Defendant's right to be so informed under the Sixth Amendment of the United States Constitution is violated.

40. Because the allegations in Counts One through Four fail to allege crimes against the Defendant with sufficient specificity, the Defendant is thwarted in his ability to prepare an adequate defense against each of these allegations, in violation of his right to due process as guaranteed by the Fifth Amendment of the United States Constitution.

41. Because the Defendant's undersigned counsel is likewise thwarted in his ability to prepare an adequate defense against these same Counts, the Defendant's right to the effective assistance of counsel under the Sixth Amendment of the Constitution is also violated.

42. Because these allegations are based largely upon the Defendant's communications that, on their face, contain protected speech without any criminal purpose, the Defendant's right to free speech under the First Amendment of the United State Constitution is violated.

### Travel Act Counts Five through Twenty-One

43. The Defendant is charged in five of the seventeen "Travel Act" counts of the

Indictment with knowingly and willfully using facilities in interstate and foreign commerce with the intent to commit any crime of violence to further extortion and money laundering, and to otherwise promote, manage, establish, carry on, and facilitate extortion and money laundering, in violation of Title 18, United States Code, Sections 1952(a)(2) and (3), and Title 18, United States Code, Section 2.

44. Of these Travel Act counts, the Defendant is charged in Counts Thirteen through Fifteen, Eighteen, and Nineteen.

45. Each Travel Act count against the Defendant consists a single act incorporated by reference to individual Overt Acts of Count One of the Superseding Indictment, each act being a specified telephone conversation without any allegation that the Defendant initiated the telephone call, and each such act stands separate and apart from the other acts alleged as the basis for criminal liability.

46. These Counts in order allege the following acts constituted a violation of Title 18, United States Code, Sections 1952(a)(2) and (3), and Title 18, United States Code, Section 2, by the Defendant:

a. As to Count Thirteen, on or about June 5, 2002, in a telephone conversation, the Defendant discussed a suicide bombing in Israel with Co-Defendant HATIM FARIZ, saying it was "successful," that twenty were killed and fifty were injured, and that it was a PIJ operation. There is no context to this statement, and there is no allegation that the Defendant received this information through means other than legitimate news sources, and in fact the Indictment states that HATIM FARIZ indicated he would watch the news that night at home about the incident. See Count One, Overt Act 291.

18

c. As to Count Fourteen, on or about June 7, 2002, in a telephone conversation, the Defendant and Co-Defendant HATIM FARIZ discussed a variety of issues, including problems at the Islamic Academy of Florida, accusations of theft against Co-Defendants SAMI AL-ARIAN and SAMEEH HAMMOUDEH, the adverse reactions of the community to the June 5, 2002, terrorist bombing, the identity maker of the bomb as someone's first cousin, and previous transfers of money to Salah Abu Hassanein. See Count One, Overt Act 293.

d. As to Count Fifteen, on or about June 19, 2002, in a telephone conversation, the Defendant told Co-Defendant HATIM FARIZ that the United States Government had contacted the Defendant's bank and obtained the Defendant's financial information and records, and HATIM FARIZ then passed this along to Co-Defendant SAMI AL-ARIAN, who refused to discuss it on the telephone. It is implicit in the Superseding Indictment that this was a true statement of fact by the Defendant that was known to and impelled by the United States Government before this conversation took place. See Count One, Overt Act 295(A) and (B).

e. As to Count Eighteen, on or about September 13, 2002, in a telephone conversation, Co-Defendant HATIM FARIZ told the Defendant that he had recently spoken with Sal;ah Abu Hassenein who thanked him for the money that was less than last year, to which the Defendant said that Hassanein must realize things had changed since last year. HATIM FARIZ also said that RAMADAN ABDULLAH SHALLAH was in the hospital for depression, and they discussed that three PIJ members had recently been killed. See Count One, Overt Act 306.

f. As to Count Nineteen, on or about November 9, 2002, in a telephone conversation, HATEM FARIZ and the Defendant discussed an AMCN fund-raising event in Florida, and FARIZ told the Defendant that SAMI AL-ARIAN had urged a group of donors to contribute to AMCN, that FARIZ had distributed pledge forms to donors, that they would arrange for AL-ARIAN to conduct another AMCN fund-raising event in Chicago, and that the Defendant would provide donors with a tax exempt number for AMCN  See Count One, Overt Act 318.

47. Upon examination of each of these Travel Act Counts, and taking each Count separately and collectively with the other Counts, there is no indication on the face of these allegations how any of the communications described in the Overt Acts demonstrate an intent on the part of the Defendant to commit a crime of violence to further extortion or money laundering or to otherwise promote, manage, establish, carry on, and facilitate extortion and money laundering, nor how any of these communications related to the purpose or goal of extortion or money laundering.

48. Because the allegations in these Travel Act Counts fail to adequately inform the Defendant of the nature and cause of the accusation against him, the Defendant's right to be so informed under the Sixth Amendment of the United States Constitution is violated.

49. Because the allegations in these Travel Act Counts fail to state how these communications indicate an intent of the Defendant to commit a crime of violence or relate to the purpose or goal of extortion or money laundering, the Defendant is thwarted in his ability to prepare an adequate defense against each of these allegations, in violation of his right to due process as guaranteed by the Fifth Amendment of the United States Constitution.

50. Because the Defendant's undersigned counsel is likewise thwarted in his ability to prepare an adequate defense against these same Counts, the Defendant's right to the effective assistance of counsel under the Sixth Amendment of the Constitution is also violated.

51. Because these allegations refer to communications that, on their face, contain protected speech without any criminal purpose, the Defendant's right to free speech under the First Amendment of the United State Constitution is violated.

52. Upon examination of each Count, and taking each Count separately and collectively with the other Counts, the allegations therein are insufficient to allege a crime against the Defendant that such knowing and willful use of telephone facilities demonstrate an intent to commit crimes of violence to further extortion or money laundering or to otherwise promote, manage, establish, carry on, and facilitate extortion and money laundering, and as such each of these seven Travel Act Counts charged against the Defendant should be dismissed for the reasons stated.

53. Because there is insufficient allegation of extortion in these Counts or in any incorporated Count of the Superseding Indictment, the references to extortion should be stricken from these Counts.

### Material Support Counts Twenty-Two through Thirty-Two and Money Laundering Counts Thirty-Three through Forty-Three

54. The Defendant is charged in Counts Twenty-Two, Twenty-Four, Twenty-Five, and Twenty-Seven through Thirty-Two with providing, attempting to provide, and causing to be provided material support and resources to the PIJ by transferring and causing to be transferred certain amounts of money to the PIJ in the West Bank and Gaza on certain dates as set out in

chart form.

55. These same amounts of money and dates are duplicated and correspond in the same order in the Money Laundering Counts Thirty-Three through Forty-Three, with the same amounts of money and dates being alleged in order against the Defendant in Counts Thirty-Three, Thirty-Five, Thirty-Six, and Thirty-Eight through Forty-Three.

56. The Defendant is charged in these same Money Laundering Counts in offenses involving interstate and foreign commerce, being material support, with transmitting and transferring, attempting to transmit and transfer, and causing to be transmitted and transferred, funds in the amounts indicated to places outside the United States, specifically the West Bank and Gaza, with the intent to knowingly provide, attempting to provide, and causing to be provided material support and resources to the PIJ.

57. The Material Support Counts alleged against the Defendant allege on their face the same elements for the same acts as alleged against the Defendant in the corresponding Money Laundering Counts, and one of each pair of corresponding Counts does not require an element that the other does not, and as such the Material Support Counts are the same offenses as the corresponding Money Laundering Counts, or alternatively either the Material Support Counts or the Money Laundering Count are lesser included offenses of their corresponding allegations, and as such the Material Support Counts and the Money Laundering Counts are multiplicitous and violate the Defendant's right against double jeopardy as guaranteed by the Fifth Amendment of the United States Constitution.

58. As such, the Material Support Counts and the Money Laundering Counts should be dismissed, or alternatively the United States should be directed to merge these Counts.

## MEMORANDUM OF LAW

### Count One: Conspiracy to Violate RICO Act

Each party to a continuing conspiracy may be vicariously liable for substantive offenses committed by a co-conspirator during the course and in furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof. See Pinkerton v. United States, 328 U.S. 640 (1946); United States v. Hansen, 262 F.3d 1217, 1246 (11th Cir. 2001). Yet it must be first proved that the conspiracy itself exists, and where there is insufficient proof that the defendant conspired with anybody, a conspiracy charge cannot be sustained. See United States v. Parker, 839 F.2d 1473 (11th Cir. 1988). The Government must show "interdependence" among the alleged co-conspirators to prove that the conspiracy was a single unified conspiracy rather than a series of smaller uncoordinated conspiracies. See United States v. Toler, 144 F.3d 1423 (11th Cir. 1998); United States v. Glinton, 154 F.3d 1245 (11th Cir. 1998). Not only must the Government prove the existence of the conspiracy, but it must show a participatory link with the defendant. See United States v. Reed, 980 F.2d 1568 (11th Cir. 1993). To link one alleged co-conspirator with another under a "wheel" theory, there must be some showing of a link between co-conspirators on the wheel. See United States v. Glinton, 154 F.3d 1245 (11th Cir. 1998). Finally, it must be shown that the defendant knowingly agreed to participate in the conspiracy. See United States v. Sarro, 742 F.2d 1286 (11th Cir. 1984).

Count One of the Indictment charges conspiracy to commit racketeering. The RICO statute does not contain any separate mens rea or scienter elements beyond those encompassed in its predicate acts. See United States v. Pepe, 747 F.2d 632, 675-76 (11th Cir. 1984). As in any

23

conspiracy, to prove a RICO conspiracy the Government must show that the defendant had knowledge of the conspiracy and willfully became a member of the conspiracy by agreeing to participate. Id., 676.

When the Government seeks to show a "pattern of racketeering activity" under 18 U.S.C. § 1962, the Government must not only allege at least two predicate acts but also must establish that the predicate acts demonstrate both relationship and continuity. See United States v. Church, 955 F.2d 688, 693 (11th Cir. 1992). Predicate acts extending over a period of weeks or months and threatening no future criminal conduct do not satisfy this requirement. Id. at 694.

Four essential elements are required to be proved in order to establish the offense of conspiracy to violate the RICO Act: first, that the conspiracy charged in the indictment was willfully formed, and was existing at or about the time alleged; second, that the accused willfully became a member of the conspiracy, that is, he objectively manifested, by his words or actions, an agreement to participate, directly or indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering activity by agreeing to participate, directly or indirectly, in two or more acts of racketeering activity; third, that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment; and fourth, that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy. See United States v. Caporale, 806 F.2d 1487, 1515 (11th Cir. 1986). An indictment must contain every element of the offense charged or it will fail constitutional muster because it fails to inform the defendant of the Government's accusations against him. See United States v. Fern, 155 F.3d 1318 (11th Cir. 1998); United States v. Stefan, 784 F.2d 1093 (11th Cir. 1986); United States v. Chilcote, 724 F.2d 1498 (11th Cir. 1984).

In Count One of the Indictment, the allegations taken together as a whole that the Defendant, GHASSAN BALLUT, conspired with any of the other Co-Defendants to conduct and participate in the affairs of the PIJ as an enterprise through a pattern of racketeering activity are insufficient to sustain the charge. Referring to all of the Overt Acts in the recitations of paragraph 2 above, apart from association or communications there is insufficient allegation of an interdependence between the Defendant and the Co-Defendants to prove that the conspiracy was a single unified conspiracy. There is also insufficient allegation of a participatory link between the Defendant and the Co-Defendants in any conspiracy to commit any of the acts described in subparagraphs (a) through (g) of paragraph 26 of the Indictment. There is no support in the Overt Acts of Count One that the Defendant knowingly agreed to participate in any conspiracy to commit these same acts. The Overt Acts in Count One fail to demonstrate both relationship and continuity between the Defendant's conduct and the alleged RICO conspiracy conduct.

As to the elements of RICO, Count One of the Indictment fails to sufficiently allege that the Defendant willfully became a member of the conspiracy by manifesting, in his words or actions, any agreement to participate, directly or indirectly, in the conduct of the affairs of the PIJ, through a pattern of racketeering activity by agreeing to participate, directly or indirectly, in two or more acts of racketeering activity. The Overt Acts referring to the Defendant and his conduct do not convey any such willful intent. These Overt Acts, presuming that they can be fully proved by evidence, show nothing more than association and communication without any suggestion of willingness to participate in the conduct of the PIJ. Additionally, the Overt Acts do not indicate that the Defendant performed any Overt Act knowing that he did so in

25

furtherance of some object or purpose of the alleged conspiracy. Finally, the substantial passage of time between Overt Acts alleged against the Defendant, particularly the hiatus of Overt Acts between 1995 and 2000 as described in subparagraphs j and k of paragraph 2 above, indicate a lack of continuity in the allegations of the Defendant's participation. See Count One, Overt Acts 235 and 258.

In addition to the failure to allege and support elements of a RICO conspiracy, the Indictment contains allegations against the Defendant that are subject to striking as not relevant to the charge and as inflammatory and prejudicial. See United States v. Awan, 966 F.2d 1415 (11th Cir. 1992); United States v. Huppert, 917 F.2d 507 (11th Cir. 1990). The Government relies heavily in Count One and throughout the Indictment on the issuance of Presidential Executive Order 12947 on January 23, 1995, declaring the PIJ to be a Specially Designated Terrorist group. There is no allegation in the Indictment that the Defendant was a member of the PIJ on or after January 23, 1995, the date of the Executive Order. There is further no allegation that the participation by the Defendant in the PIJ prior to the Executive Order resulted in conducting the affairs of PIJ through a pattern of racketeering activity. It is alleged that on or about September 29, 1991, at Chicago, the Defendant spoke militantly before a group against Israel and coalition forces in Kuwait and in support of Fathi Shiqaqi. Count One, Overt Act 9. On or about October 11, 1991, it is alleged the Defendant concealed in an INS document that he was a member and leader of the PIJ in the Chicago area. See Count One, Overt Act 10. These events occurred years before Executive Order 12947 was issued. There is no allegation that these acts were illegal. There is no rational connection made between these acts and the furtherance of the alleged conspiracy or the accomplishment of its objectives. These two Overt Acts in fact

26

constitute the Defendant's exercise of his freedom of speech and freedom of association as protected by the First Amendment of the United States Constitution. As such, these Overt Acts and other Overt Acts alleged to have occurred before January 23, 1995, are surplusage and are irrelevant, inflammatory, and prejudicial, and should therefore be stricken. See United States v. Awan and United States v. Huppert, supra.

The legal basis invoked and cited for Executive Order 12947 is Title 50, United States Code, Sections 1701 and 1702. While Section 1702 authorizes the President to prohibit transactions in foreign exchange, transfers among banks, and imports and exports of currency, and to block property interests and confiscate property, this authority specifically does not include authority to regulate or prohibit, directly or indirectly: (a) any postal, telegraphic, telephonic, or other personal communication not involving the transfer of anything of value; (b) donations by persons under United States jurisdiction of articles such as food, clothing, and medicine to relieve human suffering; (c) the importation from or exportation to any country of any information or informational materials, regardless of the medium; or (d) transactions ordinarily incident to travel to or from any country, including importation of baggage, maintenance within any country including payment of living expenses, and arrangement or facilitation of travel. Therefore, where the Indictment relies on activities by the Defendant that consisted of personal communications not involving the transfer of anything of value, or donations of specified goods, or the importation or exportation of information or informational materials, or transactions incident to travel, such activities are outside the purview of the Executive Order against the PIJ and cannot constitute Overt Acts in support of PIJ as an enterprise. Such allegations are irrelevant, inflammatory and prejudicial and should be stricken.

27

As to Count One, as well as Counts Three and Four, there is a heavy reliance upon Executive Order 12947 and the designation by both the President and the Secretary of State of the PIJ and various individuals and entities as Specially Designated Terrorists (SDT's) and Foreign Terrorist Organizations (FTO's). The basis for Executive Order 12947 is the International Emergency Economic Powers Act, Title 50, United States Code, Section 1701 et seq. The authority for the Secretary of State is the Antiterrorism and Effective Death Penalty Act of 1996. The problem is that this exercise of executive authority in naming SDT's and FTO's is based on an improper delegation of legislative authority by the Congress to the executive branch, violates the separation-of-powers doctrine, and violates the constitutional prohibition against bills of attainder.

In empowering the President and the Secretary of State to designate FTO's and SDT's, Congress necessarily had to delegate its legislative powers to the executive. Such a delegation is constitutionally sufficient if Congress clearly delineates (1) the general policy, (2) the public agency which is to apply it, and (3) the boundaries of the delegated authority. Mistretta v. United States, 488 U.S. 361, 372-73, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989); see also United States v. Brown, 364 F.3d 1266, 1270-71 (11th Cir. 2004). There have been only two instances in history where the Supreme Court has found an unconstitutional delegation of authority.

In the present case, however, the problem is that the Congress cannot delegate a power which it is prohibited from exercising. Congress is prohibited from passing any bill of attainder. See U.S. Const. art I, § 9, cl. 3. A bill of attainder is generally defined as the legislative designation of persons pronouncing them guilty of crimes without trial or conviction, resulting in the extinguishment of their rights and legal capacities. Apart from the direct constitutional

prohibition, bills of attainder also do not comport with constitutional due process guarantees.

The designation of persons and entities as SDT's and FTO's by the President and the Secretary of State amount to legislative acts directed against designated persons, pronouncing them guilty of alleged crimes without trial or conviction and assigning them a legal status. This legal status not only results in the extinguishment of their civil rights and legal capacities, but it also affects the civil rights and legal capacities of others who normally would be able to transact business and have financial dealings with these persons. As such, the SDT or FTO designation by the executive amounts to a bill of attainder against these persons. As Congress is constitutionally prohibited from passing bills of attainder, the authority to make bills of attainder cannot be extended by the Congress to the executive branch so that the executive branch can do what the Congress is prohibited from doing. Because this authority is void, the exercise of this authority through the cited designations including Executive Order 12947 is also void. Therefore, all references to Executive Order 12947 and the designation of persons and entities as SDT's and FTO's should be stricken.

For each of these reasons, Count One should be dismissed as to the Defendant, or in the alternative, those Overt Acts described above should be stricken from the Indictment.

### Count Two: Conspiracy to Murder, Maim or Injure

On all matters relating to the conspiracy component of Count Two, the Defendant incorporates herein the above law and argument pertaining to Count One concerning the elements of conspiracy and the legal requirements of indictments containing such allegations.

Count Two alleges that the Defendant knowingly, unlawfully, and willingly conspired to murder and maim persons at places outside of the United States, in violation of Title 18, United

29

States Code, Section 956(a)(1). Count Two incorporates both the means and methods of Count One, which make no specific or personal reference to the Defendant, and also incorporates the Overt Acts of Count One, which are described in paragraph 2 above. Chronologically, these Overt Acts ascribed to the Defendant various acts committed between 2000 and 2002. These Overt Acts consist entirely of telephone conversations between the Defendant and Co-Defendant HATEM FARIZ in which they discuss either past events of public knowledge and concern, or past communications by HATEM FARIZ with others in which the Defendant did not participate, or past acts of the United States, or the prospect that the United States would arrest Co-Defendant SAMI AL-ARIAN. There is nothing to suggest that the involvement of the Defendant in any of these conversations as described in these Overt Acts indicate a willingness or agreement by the Defendant to conspire to murder and maim persons outside the United States as alleged. In these telephone conversations, there is also no construction or interpretation that would support a conclusion that the Defendant's involvement in or contribution to these conversations promoted or facilitated any murder or maiming, especially as they occurred after the acts of violence described in the Overt Acts of Count One.

Even though the Government is not required to show the Defendant participated in the offenses to show conspiracy, where there are insufficient allegations in the Indictment that the defendant conspired with anybody, a conspiracy charge cannot be sustained. See United States v. Parker, supra. The Government has failed to allege the requisite interdependence between the Defendant and the other alleged co-conspirators to prove that the conspiracy was a single unified conspiracy among them. See United States v. Toler and United States v. Glinton, supra. Even if the Government has adequately alleged the existence of the conspiracy, it has failed to allege a

30

sufficient participatory link with the Defendant. See United States v. Reed, supra. The Government has also failed to allege with sufficiency that the Defendant knowingly agreed to participate in the conspiracy. See United States v. Sarro, 742 F.2d 1286 (11th Cir. 1984). Finally, the Government has failed to allege sufficiently that the Defendant had knowledge of the conspiracy and willfully became a member of the conspiracy by agreeing to participate. See United States v.Pepe, supra.

As separate grounds for dismissal or striking, Title 18, United States Code, Section 956(a)(1), recites among its elements that the defendant must be "within the jurisdiction of the United States" when conspiring and that the murder or maiming must be "an act that would constitute the offense of murder . . . or maiming if committed in the special maritime and territorial jurisdiction of the United States." Count Two of the Indictment fails to recite these elements which go to the issue of the United States' jurisdiction over this charge. As previously noted, an indictment must contain every element of the offense charged or it will fail constitutional muster because it fails to inform the defendant of the Government's accusations against him. See United States v. Fern, United States v. Stefan, and United States v. Chilcote, supra.

For the foregoing law and arguments, Count Two should be dismissed as to the Defendant.

### Count Three: Conspiracy to Provide Material Support

As stated above, on all matters relating to the conspiracy component of Count Three, the Defendant incorporates herein the above law and argument pertaining to Count One concerning the elements of conspiracy and the legal requirements of indictments containing such allegations.

31

Count Three charges the Defendant with conspiracy to knowingly provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), specifically to the PIJ, in violation of Title 18, United States Code, Section 2339B. "Material support or resources" means:

> currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

18 U.S.C. § 2339A(b). The means and methods of the conspiracy are presented independent of the other Counts.

Count Three improperly recites and relies on Presidential Executive Order 12947 to support the element that PIJ was a designated terrorist organization as defined. 18 U.S.C. § 2339B(g)(6); Indictment, Count Three, subparagraphs 3(j),(k), and (p). Such a designation must be done pursuant to section 219 of the Immigration and Nationality Act. 18 U.S.C. § 2339B(g)(6). Section 219 is classified to Title 8, United States Code, Section 1189. That section authorizes only the Secretary of State to make the "foreign terrorist organization" designation. Admittedly, Count Three makes this allegation at paragraph 3(t). Still, Executive Order 12947 cannot be relied upon to make this designation and therefore its recitation is surplusage and should be stricken. See United States v. Awan and United States v. Huppert, supra. Because the designation by the Secretary of State is the operative condition precedent to the element that the PIJ was a foreign terrorist organization, and because this event occurred on October 7, 1997, the providing of material support or resources to the PIJ was not unlawful prior to that date. Count

Three, however, alleges that these activities began "in or about 1988." To rely on allegations and proof of conduct by the Defendant prior to October 7, 1997, to support the charge in Count Three would violate the Defendant's rights against ex post facto laws and due process as guaranteed by Article I, Section 9, Clause 3, and the Fifth Amendment of the Constitution. As such, all allegations and references to any acts of material support by the Defendant prior to October 7, 1997, should be stricken.

The Defendant would also incorporate here the argument made against Count One above, that the delegation of legislative authority to the President and the Secretary of State to designate FTO's and SDT's was improper and violates the separation-of-powers doctrine. Further, these designations violate the constitutional prohibition against bills of attainder, and as such the Congress does not have the power to delegate legislative authority which is prohibited to Congress.

Any involvement by the Defendant in the means and methods of the conspiracy is neither specified or inferred except that it is alleged the Defendant "[t]hroughout the remainder of the 1990's . . . would and did continue to engage in PIJ fund-raising and support activities in a manner designed to conceal the nature of what they were doing and the source and recipients of the support." See Count Three, paragraph 3(q). Again, if by "the remainder of the 1990's" the Indictment is referring to conduct prior to October 7, 1997, such references should be stricken. This use of the term "did continue to engage" in fund-raising and support activities is meaningless when applied to the Defendant as there is no description of the activities the Defendant is alleged to have continued, and therefore it fails to properly inform the Defendant of the nature and cause of the accusation in violation of his rights under the Sixth Amendment of

33

the United States Constitution.

An essential element of Title 18, United States Code, Section 2339B, is that the recipient of the material support or resources be a "foreign terrorist organization," as defined. 18 U.S.C. § 2339B(a)(1) and (g)(6). The incorporated Overt Acts, as described in paragraph 2 above, do not sufficiently allege that the Defendant provided material support to PIJ as a terrorist organization, as opposed to some other non-designated group. These Overt Acts pertaining to the Defendant describe only telephone communications with another Co-Defendant primarily concerning past events, and by definition such communications do not constitute material support or resources. 18 U.S.C. § 2339A(b). As such, these allegations are insufficient to charge the Defendant with providing material support to PIJ.

### Count Four: Conspiracy to Make and Receive Contributions

As with the previous arguments, on all matters relating to the conspiracy component of Count Four, the Defendant incorporates herein the above law and argument pertaining to Count One concerning the elements of conspiracy and the legal requirements of indictments containing such allegations.

Count Four charges the Defendant with combining, conspiring, confederating, and agreeing to knowingly and willfully violate Executive Order 12947 by  to making and receiving contributions of funds, goods, or services to or for the benefit of Specially Designated Terrorists, in violation of Title 50, United States Code, Sections 1701 et seq., and Title 18, United States Code, Section 371, starting from an unknown date prior to January 25, 1995. Count Four relies heavily upon Presidential Executive Order 12947 issued pursuant to Title 50, United States Code, Sections 1701 et seq., but as previously presented above, this Order did not take effect

34

until January 24, 1995, prior to which PIJ was not a Specially Designated Terrorist organization. As such, all allegations concerning any activities to make and receive contributions of funds, goods, or services to PIJ prior to January 24, 1995, against the Defendant are immaterial and should be stricken.   See United States v. Awan and United States v. Huppert, supra.

The Defendant would also incorporate here the argument made against Count One above, that the delegation of legislative authority to the President and the Secretary of State to designate FTO's and SDT's was improper and violates the separation-of-powers doctrine.  Further, these designations violate the constitutional prohibition against bills of attainder, and as such the Congress does not have the power to delegate legislative authority which is prohibited to Congress.

Apart from the statement of the charge, the Defendant is not named in any substantive allegation in Count Four.  The incorporated allegations from Count One, described in paragraph 2 above, are insufficient as to the Defendant, in that there is no allegation within these incorporated paragraphs, nor is there any proper interpretation or construction of these incorporated paragraphs, that allows for the conclusion that the Defendant was making or receiving contributions of funds, goods, and services to or for the benefit of PIJ.  Count Four therefore fails to state a crime against the Defendant and fails to inform him of the nature and cause of these charges, in violation of his rights under the Sixth Amendment of the Constitution.

For these reasons, Count Four should be dismissed or its provisions stricken.

### Travel Act Counts Five through Twenty-One

A total of five Counts in the Indictment charge the Defendant with violation of the "Travel Act" by knowingly and willfully using facilities in interstate and foreign commerce with

35

the intent to commit any crime of violence to further extortion and money laundering, and to otherwise promote, manage, establish, carry on, and facilitate extortion and money laundering, in violation of Title 18, United States Code, Sections 1952(a)(2) and (3), and Title 18, United States Code, Section 2. The Travel Act also requires the allegation that the defendant acted knowingly and willfully.   See United States v.Pepe, 747 F.2d 632, 675-76 (11th Cir. 1984). Each alleged Travel Act violation consists a single act incorporated by reference to individual Overt Acts of Count One of the Indictment ascribed to the Defendant and is based on a principal theory rather than on a conspiracy theory, as the Indictment cites 18 U.S.C. § 2.

To charge a violation of the Travel Act, it must be alleged that a defendant traveled in interstate or foreign commerce or used the mail or any facility in interstate or foreign commerce with the intent to commit any crime of violence to further any unlawful activity (specified in the Indictment as extortion and money laundering), or to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, and further, that the defendant thereafter performed or attempted to perform one of these acts. 18 U.S.C. § 1952(a). To "facilitate" an unlawful activity means to "make it easy or less difficult." See United States v. Rogers, 788 F.2d 1472 (11th Cir. 1986). The allegation common to all of the Travel Act Counts against the Defendants specifies that the "unlawful activity" in question is "extortion and money laundering." Indictment, Counts Five through Forty-Four, paragraph 2.

The five Counts specifically against the Defendant allege certain acts constituting violations of Title 18, United States Code, Sections 1952(a)(2) and (3), and Title 18, United States Code, Section 2. Each and every one of these seven Counts involve a single telephone

36

conversation, one with Co-Defendant SAMI AL ARIAN, six with Co-Defendant HATEM FARIZ. It is not suggested in these Counts that there is any continuity among these telephone conversations by the Defendant, which in fact are spread out over a period of five months. It is not alleged that the Defendant initiated any of the telephone calls, and therefore the allegation as to each Count that he "did knowingly and willfully use a facility" is insufficient to constitute a criminal offense under this statute. It is not alleged that the Defendant in participating in these telephone conversations either caused an act to be committed or committed an act himself that promoted, managed, established, carried on, or facilitated the unlawful activities of extortion or money laundering, and there is no allegation of the actual performance or attempt to perform an act of an unlawful activity by the Defendant, as required by the Travel Act statute. 18 U.S.C. § 1952(a). There is no connection made between each alleged telephone conversation and its effect upon the unlawful activities of extortion or money laundering. The conversations in many of these Counts pertain only to past events in which the Defendant did not participate, one of which was instigated by the United States. As such, each of these allegations is insufficient to constitute a criminal charge against the Defendant and should be dismissed.

Because these allegations are insufficient, several of the Defendant's constitutional rights are implicated. Because the allegations in these Counts do not adequately inform the Defendant of the nature and cause of the accusations, the Defendant's right to be so informed under the Sixth Amendment of the United States Constitution is violated. The allegations in these Counts fail to state how these communications indicate an intent of the Defendant to commit a crime of violence or relate to the purpose or goal of extortion or money laundering, and so the Defendant is thwarted in his ability to prepare an adequate defense against each of these allegations, in

violation of his right to due process as guaranteed by the Fifth Amendment. By extension, the Defendant's right to the effective assistance of counsel under the Sixth Amendment of the Constitution is also violated. Most disturbingly, these allegations refer to communications that, on their face, contain protected speech without any criminal purpose, and continued prosecution of the Defendant would be in violation of his right to free speech under the First Amendment of the United State Constitution. Based on this, all seven of the Travel Act Counts against the Defendant should be dismissed.

### Material Support Counts Twenty-Two through Thirty-Two and Money Laundering Counts Thirty-Three through Forty-Three

The Fifth Amendment of the Constitution prohibits two prosecutions for the same offense and also protects against multiple punishments for the same offense. United States v. Adams, 1 F.3d 1566 (11th Cir. 1993). This includes protections against prosecution and punishment for an offense and its lesser included offenses. Brown v. Ohio, 432 U.S. 161 (1977). Where a single act is an offense against two statutes, and where each statute does not require an additional fact apart from the elements of the other statute, then a defendant cannot be prosecuted and punished under both statutes. Blockburger v. United States, 284 U.S. 299 (1932). Where two separate allegations in the same indictment charge the same elements for the commission of the same act, they are multiplicitous and therefore violate the double jeopardy provision of the Fifth Amendment. United States v. Cassano, 372 F.3d 868, 881-882 (7th Cir. 2004).

The material support allegations in Counts Twenty-Two, Twenty-Four, Twenty-Five, and Twenty-Seven through Thirty-Two are multiplicitous to their counterpart money laundering allegations in Counts Thirty-Three, Thirty-Five, Thirty-Six, and Thirty-Eight through Forty-

38

Three. Although the cited statutory bases for these counts are different, the elements of each material support count is precisely the same as the elements in its counterpart money laundering count. Although the Government is required to prove one element in the money laundering counts that the money was intended for an illegal purpose, the basis of the illegality is that the laundered funds were intended for material support. As such, both the money laundering counts and the material support counts should be dismissed. Alternatively, the Court may direct the Government to merge these counts with one another. Id.

Respectfully submitted,

_____
Bruce G. Howie
Florida Bar No. 263230
Attorney for GHASSAN ZAYED BALLUT
Piper, Ludin, Howie & Werner, P.A.
5720 Central Avenue
St. Petersburg, FL 33707
Telephone (727) 344-1111
Facsimile (727) 344-1117
E-mail: howie@piperludin.com

## Certificate of Service

I HEREBY CERTIFY that on October 29, 2004, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Terry A. Zitek, Esq.
Office of the United States Attorney
400 North Tampa Street, Suite 3200
Tampa, FL 33602

William B. Moffitt, Esq.
Cozen O'Connor, P.C.
1667 K Street, N.W., Suite 500
Washington, DC 20006-1605

Cherie L. Krigsman, Esq.
Office of the United States Attorney
601 D Street N.W., Suite 6500
Washington, DC 20530

M. Allison Guagliardo, Esq.
Office of the Federal Public Defender
400 North Tampa Street, Suite 2700
Tampa, FL 33602

Stephen N. Bernstein, Esq.
P.O. Box 1642
Gainesville, FL 32602-1642

Linda G. Moreno, Esq.
1718 East 7th Avenue
Suite 201
Tampa, FL 33605


S/ Bruce G. Howie
Bruce G. Howie
Florida Bar No. 263230
Attorney for GHASSAN ZAYED BALLUT
Piper, Ludin, Howie & Werner, P.A.
5720 Central Avenue
St. Petersburg, FL 33707
Telephone (727) 344-1111
Facsimile (727) 344-1117
E-mail: howie@piperludin.com